# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| J.L.N. By and Through His Guardian Ad Litem JOSE NUNEZ<br><br>Plaintiff,<br><br>v.<br><br>GROSSMONT UNION HIGH SCHOOL DISTRICT,<br><br>Defendant. | Case No.: 17-cv-2097-L-MDD<br><br>**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT** |

Pending before the Court are cross-motions for summary judgment in this appeal from the California Office of Administrative Hearings ("OAH") under the Individuals with Disabilities Education Act, 20 U.S.C. §1400 *et seq.* ("IDEA" or "Act"). The motions are fully briefed. For the reasons stated below, Plaintiff's motion is denied. Defendant's motion is granted.

/ / / / /

## I. BACKGROUND

Plaintiff has a learning disability and a speech or language impairment. (*See, e.g.,* Ex. D-3;[1] *see also* Nunez at 18[2] (auditory processing disorder).) His native language is Spanish. (Ex. D-3.) Plaintiff attended Steele Canyon High School ("Steele Canyon") starting fall 2014. (Ex. D-17 (academic transcript)).) At the time of the OAH hearing, Plaintiff was in the 11th grade and had completed eleven quarters at Steele Canyon. (Ex. D-17.) He was in the college preparation program, and took classes in the regular curriculum, including college preparation classes. (Nunez at 51, 54-57; Wolken at 163; Ex. D-17.) His grades were mostly Cs, with some Bs, and a few As and Ds. (Ex. D-17.) He was on track to receive a regular high school diploma. (Nunez at 49; Woken at 166-67.)

The parents selected Steele Canyon because their friends' children attended the school and Plaintiff was interested in sports. (Nunez at 61.) They also chose it because of its unique program. (Nunez at 61-62.) Classes are given on a quarterly schedule, which means that fewer classes are taken simultaneously. Plaintiff's parents thought this would be more suitable for him because he had trouble with organizing and planning. (Nunez at 99, 82.) On the other hand, Steele Canyon has an increased focus on academics (Wolken at 152), and the quarter system makes school work more rigorous (Terrones at 282; *see also* Wolken at 164-65). Steele Canyon also has higher graduation

---

[1] Citations to exhibits are to the parties' exhibits at the administrative hearing. Plaintiff's exhibits were marked with the prefix "S," and Defendant's exhibits were marked with the prefix "D." Exhibits are included in the Administrative Record and were filed with this Court as doc. no. 34-1 at 72 through 34-3 at 108.

[2] Citations to witness testimony are to hearing transcripts from the administrative hearing, included in the Administrative Record, and filed herein as doc. no. 34-4 at 132 through 34-4 at 820). Citations are to witnesses by name and page numbers as assigned by the transcriber.

requirements than other high schools in the District. (Wolken at 154-58.) For example, it requires ten more academic credits which consist of an additional quarter of science (Wolken at 156-57) and a senior presentation summarizing and reflecting on the high school experience (Wolken at 158-59).

On the quarter system, a student is required to take at least three "blocks," one of which can be special education ("SAI" or "specialized academic instruction") class. (Terrones at 282, 327.) Students have the option, but are not required to, take four blocks per quarter. (Terrones at 326.) Plaintiff took four blocks every quarter, one of which was SAI. (Ex. D-17; *see also* Terrones at 326; doc. no. 40-1 ("Pl.'s MSJ") at 8.[3]) He also participated in swimming and water polo five of the quarters. (Nunez at 62-63; Ex. D-17; *see also* Terrones at 326.) During the season, two quarters per year, he practiced with the team approximately 1 1/2 hours per day after school. (Nunez at 62-63, 66.) He finished school at approximately 2:40, he started practice at 4:30, and came home at 6. (Nunez at 63.) He did homework after dinner. (Nunez at 63.)

Plaintiff received special education before high school and continued at Steele Canyon. Starting in his freshman year, he attended SAI either as a Study Hall or Study Skills class in addition to his regular curriculum courses. (Ex. D-17, Nunez at 45-46, 54-55, *see also* Terrones at 326.) SAI classes are special education classes in the core content areas at the high school level to teach study skills and support students with questions about core material. (Terrones at 327-28; *see also* Wolken at 117-18.)

At the beginning of Plaintiff's freshman year in September 2014, the District performed a Multidisciplinary Special Education Evaluation, including the Wechsler Individual Achievement Test ("WIAT"). (Exs. S-4, D-2; *see also* Wolken at 122-26.) Plaintiff's cognitive abilities were within the low average range, evidence was found of

---

[3] Citations to briefs are to the Court's docket with page numbers as assigned by the electronic case filing system.

an auditory processing disorder, no social/emotional or behavioral problems were identified, and he was found to perform below grade level in almost every category of math and language proficiency measured by WIAT. (Ex. D-2.)

The District developed individualized special education programs ("IEPs") for Plaintiff. It held annual IEP meetings starting September 26, 2014. (Ex. D-3.) Plaintiff's mother actively participated in those meetings. (Nunez at 18, 69-70, 72.) At the September 26, 2014 meeting, she expressed a concern regarding Plaintiff's grades and additional tutoring. (Ex. S-2.) The results of previous tests and teacher observations since the beginning of the school year were included in the IEP's present levels of academic achievement and functional performance ("present levels"). Goals were set in the areas of math and language. Plaintiff was to take general education courses and SAI to help him with his math and English classes in a small group setting.

In 2015, Plaintiff's parents retained an advocate to help them understand his needs and assist in the IEP process.[4] (Nunez at 67-68, 77, 97-98.) The advocate attended IEP meetings with the parents. (Nunez at 67.) At Plaintiff's mother's request, additional IEP meetings were held between annual meetings. (Nunez at 69.) For example, on August 28, 2015, an amendment to the IEP was made when Plaintiff's mother expressed a concern about his declining self-esteem. (Ex. D-7.) Plaintiff's teacher advocate explained the SAI program provided during the Study Skills class. It was decided that Plaintiff should use headphones to help him focus on the teacher during classes. (*Id.*) The math teacher suggested tutoring after school and discussed scheduling around Plaintiff's water polo practices. (*Id.*; Nunez at 82.) However, Plaintiff did not take advantage of the tutoring because his only option was to take it at lunchtime, and he did not want to use his lunch break for tutoring. (Nunez at 82.)

/ / / / /

---

[4] Plaintiff's retained advocate is different than the teacher advocate assigned to Plaintiff by Steele Canyon. (*Cf.* Nunez at 67-68 & 47-48.)

Plaintiff's second annual IEP meeting was held on October 23, 2015, when Plaintiff was in the tenth grade. (Ex. D-8.) The IEP included a transition plan to ensure sufficient credits for Plaintiff to graduate with a regular diploma and transfer to college to study video game design or a subject that would lead to a job in the sports industry. Although Plaintiff's goals were updated to keep him on track toward graduation, his present levels were only partially updated since the September 2014 IEP. To meet Plaintiff's goals, the District offered several services, including SAI classes and speech therapy (Nunez at 48-49), as well as assistive technology (headphones and iPad), accommodations in test taking, and help with organization.

Based on his mother's concern about low self-esteem and anxiety, which was thought to hinder Plaintiff's academic progress, the IEP team referred him for an Educationally Related Mental Health Assessment. (Nunez at 74-75; Ex. D-9.) The school psychologist who prepared the assessment recommended school-based individual therapy to develop positive coping strategies and help Plaintiff do better at school.

A special IEP meeting was held on January 19, 2016 in light of the assessment. (Ex. S-14.) The IEP team prepared an amended IEP incorporating the psychologist's recommendation for therapy and added mental health goals. (Nunez at 31-32.)

Another special IEP meeting was held on March 8, 2016 to follow up on the effectiveness of accommodations, assistive devices and therapy. (Ex. D-11.) Plaintiff's mother was concerned that he was not keeping track of his assignments, although an iPad was provided for Plaintiff to take photos of class agendas and teacher's notes. Plaintiff was also receiving study guides shortly before taking tests. His test scores had improved, and he was reminded to use his assistive devices, for example, the text-to-speech feature on his iPad. Plaintiff's mother had questions about an independent educational evaluation ("IEE") and was provided information to schedule it.

A progress review IEP meeting was held on April 8, 2016, at the end of the third quarter. (Ex. D-12.) The IEP team reviewed Plaintiff's grades and school projects.
/ / / / /

Plaintiff's mother was receiving weekly reports from his teachers. The IEE observations were in progress, and the team discussed setting up a classroom observation.

The IEE report was completed on June 15, 2016 by an outside child and adolescent psychologist. (Ex. S-17.) The report concluded that Plaintiff's main weaknesses were in the areas of attention, planning, and organization. The report recommended continuing with the SAI class, but with more focus on developing Plaintiff's executive functioning skills. The report also found the current accommodations and assistive technologies to be appropriate; however, Plaintiff had to be reminded to use them. Finally, the report recommended setting goals in the areas of independent learning, and independent use of accommodations and assistive devices.

The IEP team met on August 31, 2016. (Ex. D-14.) The psychologist who prepared the IEE report presented his observations and findings. The team discussed the IEE observations, Plaintiff's progress, his progress in therapy, and reviewed and adjusted Plaintiff's accommodations and assistive devices.

Plaintiff's third annual IEP meeting was held on October 20, 2016, when Plaintiff was in the eleventh grade. (Ex. S-21.) The IEP team reviewed and refined the transition plan to ensure Plaintiff was still on track to graduate with a regular diploma and transfer to college in the area of his interest (video game design or sports industry). His present levels were updated. New goals were added to reflect the IEE report as well as in the areas of transition planning, mental health, math, reading, and writing. (*Id.* at 13-22.) However, it appears that some goals (grammar & syntax, math 2, writing organization, and word analysis) were not updated since 2015. (*Id.* at 9-12.) The accommodations, assistive devices and services were continued from the prior year, including individual counseling. Services related to transition to college (college and career awareness, assessment and guidance) were added. The advocate teacher requested Plaintiff to complete the Achieve 3000 diagnostic test at the SAI class, and requested him to regularly use the program. Plaintiff's mother was concerned about what was done in the Study Skills class to improve his executive functioning skills.

6

17-cv-2097-L-MDD

The October 10, 2016 meeting was continued on November 17, 2016, and an updated annual IEP was prepared. (Ex. S-22.) Plaintiff's transition plan was discussed in more detail. Plaintiff's mother informed the rest of the team that Plaintiff was working on his executive skills through the family doctor by attending group sessions every other week. Plaintiff had been tested on Achieve 3000 as his mother requested. In addition to extra time Plaintiff was already given for test taking, his mother requested a study guide with answers three days before testing, and her request was granted. She also requested frequent follow-up IEP meetings to stay on top Plaintiff's progress. Finally, the updated annual IEP also updated some of Plaintiff's goals.

On May 10, 2017, an IEP meeting was held to review Plaintiff's progress. (Ex. S-25.) The SAI teacher explained the focus of the Study Skills class and provided weekly and daily schedules to Plaintiff's parents. The team discussed Plaintiff's assignment completion and executive skills, and the prospect of another assessment.

In addition to attending IEP meetings, Plaintiff's mother closely monitored his progress. She was in frequent contact with his teachers (Nunez at 57-59, 69-70; *see also* Wolken at 176-77); she assisted him with assignments during his freshman year (Nunez at 57-59, 63-64); and reviewed his quarterly grade reports (Nunez at 50).

Plaintiff claims that some of the IEPs did not comply with the IDEA. Accordingly, on February 23, 2017, he filed a request for a due process hearing with the OAH. Administrative Law Judge Chris Butchko ("ALJ") issued a decision on July 28, 2017 (Doc. no. 34-4 at 109 ("Decision")) denying Plaintiff's claims. The ALJ determined that although some of the IEPs were deficient, they did not violate Plaintiff's rights under the IDEA. Plaintiff appealed the Decision to this Court. He requests the Court to overturn the ALJ's Decision and award attorneys' fees.

**II.    DISCUSSION**

Although the parties present the appeal as cross-motions of summary judgment, "the procedure is in substance an appeal from an administrative determination, not a

/ / / / /

summary judgment." *Capistrano Unif. Sch. Dist. v. Wartenberg*, 59 F.3d 884, 892 (9th Cir. 1995).

In reviewing appeals from OAH decisions, a district court:

(i) shall receive the records of the administrative proceedings;
(ii) shall hear additional evidence at the request of a party;[5] and
(iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.

20 U.S.C. §1415(i)(2)(C). "Based on this standard, complete de novo review of the administrative proceeding is inappropriate." *J.W. v. Fresno Unif. Sch. Dist.,* 626 F.3d 431, 438 (9th Cir. 2010) (internal quotation marks and citations omitted). The requirement to receive the records "carries with it the implied requirement that due weight shall be given to [the administrative] proceedings." *Bd. of Educ. v. Rowley,* 458 U.S. 176, 206 (1982) ("*Rowley*").

Nevertheless, "courts give less deference than is conventional in review of other agency actions. How *much* deference to give state educational agencies . . . is a matter for the discretion of the courts." *J.W.*, 626 F.3d at 438 (emphasis in original). More deference is given "if the findings are thorough and careful." *A.M. v. Monrovia Unif. Sch. Dist.,* 627 F.3d 773, 778 (9th Cir. 2010); *see also M.C. v. Antelope Valley Union High Sch. Dist.*, 858 F.3d 1189, 1194 (9th Cir. 2017). The district court "must actually examine the record to determine whether it supports the ALJ's opinion." *M.C.*, 858 F.3d at 1194 n.1.

> The Court, in recognition of the expertise of the administrative agency, must consider the findings carefully and endeavor to respond to the hearing officer's resolution of each material issue. After consideration, the court is free to accept or reject the findings in part or in whole.

---

[5] Plaintiff's motion to supplement administrative record was denied. (Doc. no. 39.)

*J.W.,* 626 F.3d at 438 (internal quotation marks and citations omitted). The ultimate determination whether an IEP was sufficient to provide a free appropriate public education ("FAPE") as required by 20 U.S.C. §1412(a)(1) is reviewed *de novo*. *M.C.*, 858 F.3d at 1194; *A.M.,* 627 F.3d at 778. Nevertheless,

> nothing in the Act . . . suggest[s] that merely because Congress was rather sketchy in establishing substantive requirements, as opposed to procedural requirements for the preparation of an IEP, it intended that reviewing courts should have a free hand to impose substantive standards of review which cannot be derived from the Act itself. In short, the statutory authorization to grant "such relief as the court determines is appropriate" cannot be read without reference to the obligations, largely procedural in nature, which are imposed . . . by Congress.

*Rowley,* 458 U.S. at 206. Accordingly, a district court's inquiry on review of OAH decisions is twofold:

> First, has the State complied with the procedures set forth in the Act? And second, is the [IEP] developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits? If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more.

*Id.* at 206-07.

Where, as here, the student is the party seeking relief on appeal, he "bears the burden of demonstrating that the ALJ's decision should be reversed [as well as] the burden of persuasion on each claim challenged." *J.W.,* 626 F.3d at 438.

Plaintiff argues that in developing some of the IEPs, the District failed to comply with IDEA's procedural requirements. These procedural requirements are important to ensure disabled students receive a FAPE -- the level of education they are entitled to. *See Endrew F. v. Douglas County Sch. Dist.*, __ U.S. __, 137 S. Ct. 988, 1000 (2017). However, "[n]ot every procedural violation . . . is sufficient to support a finding that the child in question was denied a FAPE." *Amanda J. v. Clark County Sch. Dist.*, 267 F.3d 877, 892 (9th Cir. 2001). In this regard, the IDEA provides:

/ / / / /

(ii) Procedural issues

> In matters alleging a procedural violation, a hearing officer may find that a child did not receive a free appropriate public education only if the procedural inadequacies—
>
> (I) impeded the child's right to a free appropriate public education;
>
> (II) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child; or
>
> (III) caused a deprivation of educational benefits.

20 U.S.C. §1415(f)(E)(ii). "Technical deviations . . . will not render an IEP invalid." *Amanda J.*, 267 F.3d at 892 (internal quotation marks and citation omitted). However,

> if the court finds procedural inadequacies that result in the loss of educational opportunity, or seriously infringe the parents' opportunity to participate in the IEP formulation process, or that caused a deprivation of educational benefits, . . . the court need not reach the question of substantive compliance [with IDEA].

*M.M. v. Lafayette Sch. Dist.*, 767 F.3d 842, 852 (9th Cir. 2014) (internal quotation marks and citation omitted); *see also* 20 U.S.C. §1415(f)(E). In other words, if procedural inadequacies are such as to amount to the denial of FAPE, the court need not reach the issue of substantive compliance, *i.e.*, "whether the resulting IEPs were reasonably calculated to enable [the student] to receive educational benefits." *M.M.*, 767 F.3d at 856.

### A. October 23, 2015 IEP

Plaintiff contends that his second annual IEP was deficient because his present levels for math, reading and writing were not updated from the September 26, 2014 IEP and because the IEP was lacking measurable goals. The ALJ agreed with Plaintiff that

/ / / / /

the IEP did not include adequate present levels.  (Decision at 14-15.)[6]  Nevertheless, he concluded that this procedural violation did not deprive him of his substantive rights under the IDEA.  (*Id.* at 17.)  The ALJ also rejected Plaintiff's contention that the IEP was procedurally deficient for the additional reason that it did not develop appropriate goals.  Plaintiff argued the goals were not measurable because the IEP did not develop a baseline because the present levels were deficient.  (*See* Reply (doc. no. 44) at 7.)  The ALJ rejected this contention because Plaintiff did not address the goals on the merits but based the contention entirely on the general proposition that an IEP cannot include appropriate goals if it does not include adequate baselines or current levels.  (Decision at 18-19.)  Plaintiff reasserts the same argument in his appeal of the ALJ's Decision, arguing that the failure to update the math, reading and writing present levels seriously impedes the parents' opportunity to participate in the decisionmaking process.

Plaintiff relies on of *M.M. v. Lafayette School District* for the proposition that a failure to update present levels makes it impossible for parents to meaningfully participate in the decisionmaking process.  Although *M.M.* held that on the facts presented in that case the parents were denied an opportunity to meaningfully participate in the IEP process, *M.M.* does not stand for the broad proposition advocated by Plaintiff.

The school district in *M.M.* for more than two years failed to disclose to the parents the full assessment report of their child's reading test.  The full assessment was disclosed only when the parents submitted a written request for all records relating to their child.  767 F.3d at 852; *see also id.* at 847, 853, 855.  Because of the longstanding failure to disclose, some IEP team members had information about the child's learning disability that was not made available to the parents.  *Id.* at 856.  The court found the parents were deprived of meaningful participation in the IEP process because, without the full report,
/ / / / /

---

[6]  Page numbers are as they appear in the Decision itself.

they were unable to understand their child's unique deficits and the extent to which he was not able to meaningfully benefit from the special education services provided. *Id.*

Plaintiff does not contend that in relation to the October 23, 2015 IEP, his parents were withheld information. He contends that the IEP did not include updated present levels and measurable goals. That his parents were not withheld information does not excuse the District's failure to comply with IDEA's procedural requirements, *see* 20 U.S.C. §1414(d)(1)(A)(i) (requiring IEPs to include present levels and measurable goals); however, it may mitigate any impediment to the parents' opportunity to participate in the decisionmaking process, *see id.* §1415 (f)(E)(ii)(II).

Plaintiff's mother testified that she could not discern his current abilities or present levels from the IEP document. (Nunez at 27-29.) However, she closely monitored his performance and was acutely aware of it. Until sometime during the 2015/16 school year, she assisted Plaintiff with homework. (*Id.* at 59-60, 63-64.) When she stopped, she continued to closely monitor his school work, knew what he was struggling with, and compared his progress to that of his siblings. (*Id.* at 18, 58, 60, 101.) She regularly communicated with teachers about assignments and monitored grades on an ongoing basis. (*Id.* at 57-60, 69-70.)

At the October 2015 IEP meeting, Plaintiff's mother asked why he had not improved and why his reading levels stayed the same between 2014 and 2015. She also requested more assistance with reading and writing. (Nunez at 27, 29). Plaintiff does not contend that the outdated present levels in the IEP impeded her from participating in the decisionmaking process. To the contrary, his mother attended the October 2015 IEP meeting with a privately retained expert advocate to assist her with the process. (*Id.* at 18, 67-68, 87 (expert), 99-100.) She knew she could ask questions and request services, evaluations and additional IEP meetings. She exercised those rights, and her requests were granted. (*See, e.g., id.* at 69, 72.) When she could not understand what was being discussed at the meeting, she asked her advocate for assistance, or reviewed materials and asked questions after the meeting. (*Id.* at 98-99, 100-101.) The only question she

believes was not adequately answered at the IEP meeting was why her son was not improving. Other team members offered that he needed to use the special education computer programs which were offered in addition to the Study Skills class he was attending. (*Id.* at 96, 100-101.) The parent's testimony shows that she was closely involved in her son's education but was not satisfied with his progress. Nowhere in her testimony is it apparent that she was impeded in meaningfully participating in the IEP process or in the formulation of the October 2015 IEP.

The failure to update the present levels between the September 2014 IEP and the October 2015 IEP was a procedural violation of the IDEA. However, Plaintiff's parents were not significantly impeded in their opportunity to meaningfully participate in the decisionmaking process. Accordingly, the procedural violation did not rise to the level of denying Plaintiff the FAPE. *See* 20 U.S.C. §1415(f)(E)(ii)(II).

The ALJ did not specifically address the issue whether the October 2015 included measurable goals, because as here, Plaintiff did not address the issue on the merits before the OAH. (Decision at 19.) Plaintiff argues that the goals were not measurable, because their baselines were derived from the present levels, which had not been updated since 2014. He further argues that this significantly impeded the parents' opportunity to participate in the IEP process. (Mot. at 23.) The evidence shows that Plaintiff's parents were not impeded in meaningfully participating in the decisionmaking process and took the opportunity to do so. Accordingly, Plaintiff's argument that he was denied a FAPE because of inadequate baselines in the October 2015 IEP is also rejected.

The ALJ's Decision denying Plaintiff's claims with regard to the October 2015 IEP is supported by the record. For the reasons discussed above, Plaintiff's motion to overturn the Decision in this regard is denied.

**B.      January 19, 2016 IEP Amendment**

Plaintiff contends that the January 19, 2016 amendment IEP lacked adequate present levels and baselines, which rendered the goals unmeasurable. The purpose of the

/ / / / /

meeting was to review the results of Plaintiff's Educationally Related Mental Health Assessment, which was provided at his mother's request.

At the October 23, 2015 meeting, Plaintiff's parents expressed a concern about anxiety. (Ex. D-8 at 25.) The assessment was ordered at their request. (*See* Ex. D-9 at 1.) Specifically, Plaintiff's mother was concerned that Plaintiff's "learning disability is the root cause of his anxiety and low self-esteem." (*Id.* at 1, 2.) The school psychologist, who performed the assessment agreed and recommended school based individual therapy. (*Id.* at 2.) The IEP team met to review the assessment results. (Ex. S-14.) At the meeting, Plaintiff's mother reiterated concern about Plaintiff's anxiety and low self-esteem, the team reviewed the assessment with the psychologist who prepared it, and decided to add individual therapy services and set two related goals – to reduce anxiety from five days a week to two to be better able to concentrate on school work, and develop five positive statements about himself to increase self-esteem. (Ex. S-14 at 2-3; *see also id.* at 5.) The stated baseline was that the assessment indicated concerns with low self-esteem and anxiety. (*Id.* at 2-3.) The IEP added individual therapy to Plaintiff's services.

When considered in context, the January 19, 2016 IEP included sufficient information to provide present levels and baselines as well as measurable goals. The IEP states Plaintiff's low self-esteem and anxiety were interfering with this school work – information that the parents themselves provided to the IEP team and the psychologist. The goals were stated in quantifiable terms to determine whether Plaintiff is improving over time. The therapy services, which were focused on Plaintiff's ability to reduce anxiety and build self-esteem with strategies to complete his school work were provided to achieve the goals.

Plaintiff bases this claim in part on the fact that his mother and the retained advocate, who were present at the meeting, did not receive a copy of the assessment report. (Nunez at 77-79.) It is undisputed that the District should have provided them with a copy and no satisfactory explanation has been provided. Nevertheless, Plaintiff's mother testified that her advocate assisted her with understanding the assessment

reviewed at the meeting. (*Id.* at 76-77.) Plaintiff does not contend that the failure to provide a copy precluded her from understanding Plaintiff's needs or meaningfully participating in shaping his IEP.

The Court therefore finds the ALJ's decision finding no IDEA violation supported by the record. (*See* Decision at 19.) Neither the District's failure to timely provide a copy of the assessment nor the present levels, baselines or goals render the IEP invalid.

### C. March 8, 2016 IEP Amendment

Plaintiff points to the notes of the March 8, 2016 progress meeting to argue that the District "cleaned up" the goal baselines without the parents' input, which constitutes another violation of the IDEA. This contention is belied by the notes of the IEP amendment, which show that the team, including Plaintiff's mother and retained advocate, discussed Plaintiff's progress on his goals, and signed the IEP amendment. (Ex. S-15 at 1; Trower at 111.) Plaintiff presented no evidence that his parents were not provided a full opportunity to meaningfully participate in amending the IEP, including the baselines.

Plaintiff next contends that the goals, as amended, do not remedy the initial deficiencies, because the changes occurred months after the annual IEP meeting in October 2015. The ALJ agreed with Plaintiff (Decision at 19), but nevertheless found no IDEA violation. This Court concurs. As discussed, Plaintiff had not met his burden to show that the goals as stated prior to the March 8, 2016 IEP meeting were so deficient as to invalidate the IEP. Accordingly, Plaintiff's argument is rejected.

### D. November 17, 2016 IEP

Plaintiff contends that the November 17, 2016 IEP lacked adequate present levels and baselines in the areas of math and behavioral/emotional functioning, and that the goals in those areas were not measurable. This argument is rejected in large part for reasons stated above.

While Plaintiff is correct that the present level and baselines in the area of math include some historical information, he omits the pertinent information which was

provided, such as standardized assessment results and grades, and the variations that can result between different tests, depending on testing standards applied and whether a student is prepared or feels well when the particular test is taken. (*See* Ex. S-22 at 5, 9, 17; Trower at 51-52, 76-77.) The ALJ's conclusion that Plaintiff had not shown the math present levels to be inadequate is supported by the record. (*See* Decision at 16.)

Plaintiff also contends that one of Plaintiff's math goals was unrelated to his baseline and was therefore unmeasurable. (*See* Ex. S-22 at 9.) The Court disagrees. The baseline sets forth Plaintiff's performance on standardized assessments and course work, which is sufficiently related to the goal to calculate a monthly payment and finance charge on an installment loan. The ALJ's conclusion, which finds no defect in the baseline or the goal, is supported by the record. (*See* Decision at 19.)

Next, Plaintiff challenges the present level in the social emotional/behavioral area. The present level states that Plaintiff "achieved his goals in managing his anxiety and improving his self-esteem," and that he "needs to continue to practice the coping skills that he has learned and to maintain his increased self-esteem." (Ex. S-22 at 5.) The school psychologist recommended continuing therapy. (*Id.*) The baseline for the related goal states that Plaintiff "tends to focus on his weaknesses and challenges in front of him." (*Id.* at 23.) The meeting notes indicate that Plaintiff's mother as well as the therapist reported on his progress and discussed goal setting. (*Id.* at 31; *see also id.* at 21, 22 (progress reports).) Accordingly, the ALJ's conclusion that the present level in this area are adequate is supported by the record, and Plaintiff's contention that the IEP was insufficient for his mother to understand his needs (Mot. at 22) is unsupported.

Finally, as with math, Plaintiff contends that the baseline for one of his mental health goals was unrelated to the goal, and that the goal was therefore unmeasurable. (*See* Ex. S-22 at 23.) The baseline indicated that Plaintiff tends to focus on his weaknesses and challenges, and the related goal was to "practice positive self-talk and recognize tasks/goals that he has accomplished at least 4 out of 5 instances over 6 consecutive weeks with 75% accuracy." (*Id.* at 23.) The ALJ found that the baseline was

inadequate, but that the goal was nevertheless measurable and related to Plaintiff's needs. (Decision at 20.) This conclusion is supported by the record, as the information elsewhere in the IEP clearly states Plaintiff's need in the area of self-esteem, and the goal is presented in quantifiable terms.

To the extent Plaintiff has shown any procedural deficiencies with respect to the present levels, baselines or goals stated in the November 2016 IEP, they did not invalidate it. As reflected by the record, none of the alleged violations hindered the parents' opportunity to participate in the decisionmaking process. As reflected in the IEP's meeting notes and her own testimony, Plaintiff's mother meaningfully and consistently participated in the IEP process. The evidence of her participation does not evince that she was withheld or lacked information regarding Plaintiff's needs.

**E.     Conclusion**

Plaintiff acknowledges in his reply that the ultimate issue is whether the alleged defects in the present levels, baselines or goals resulted in denial of free appropriate public education ("FAPE") under the IDEA. (Reply at 1.) Although it is not the case that "every handicapped child who is advancing from grade to grade . . . is automatically receiving a [FAPE]", when, as here, "a child is fully integrated in the regular classroom, as the Act prefers," providing FAPE "typically means . . . providing a level of instruction reasonably calculated to permit advancement through the general curriculum." *Endrew F.*, 137 S. Ct. at 1000 & n.2 (internal quotation marks and citations omitted, initial ellipsis and bracket in original). Based on the record, the Court finds that the District provided Plaintiff with a FAPE.

/ / / / /

## III. ORDER

For the reasons stated above, Plaintiff's motion for summary judgment is denied. Defendant's cross-motion is granted. The decision of the California Office of Administrative Hearings is affirmed.

**IT IS SO ORDERED.**

Dated: September 30, 2019

_____
Hon. M. James Lorenz
United States District Judge